UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:17-00161 |
| | ) | JUDGE RICHARDSON |
| CECIL CLINT WOODARD | ) | |

### SENTENCING MEMORANDUM FOR CECIL CLINT WOODARD

Cecil Clint Woodard, through counsel, files the instant sentencing memorandum in support of a sentence below the advisory guideline range. Mr. Woodard submits that the advisory guidelines range of life is excessive and far "greater than necessary" to satisfy the objectives of sentencing set forth in 18 U.S.C. § 3553(a).

## I. FACTUAL BACKGROUND

Mr. Woodard has long suffered from a serious drug addiction, after a childhood rife with physical, emotional, and sexual abuse.

Mr. Woodard has an extensive family history of addiction and mental health issues. (Presentence Report ("PSR") at ¶ 187-88, 190.) Thus it is safe to assume that he "inherited a genetic makeup that had a strong propensity toward substance abuse." (Exhibit 1, Report of Dr. James S. Walker, at p. 3.) In addition to the genetic factors, growing up in a home strongly impacted by addiction makes a child further predisposed to suffer from addiction himself, as well as various mental health issues, and mood and psychiatric disorders. (*Id.*)

Not surprisingly, Mr. Woodard's addiction started at an early age. (PSR at ¶ 205, 212.) He began drinking at age eight, using marijuana at age ten, and using methamphetamine (as well as a variety of other drugs) in his late teens. (*Id.* at ¶ 205.) Since age 27, he used approximately a gram per day of meth, a very large amount. (*Id.*) Such serious drug use has significant effects on the brain, affecting decision making, emotional regulation, and causing cognitive deficits. (Ex. 1, at p. 2.) Meth specifically is known to cause hypersexuality and can also create an emotional numbing effect on users. (*Id.* at p. 3.)

Further, Mr. Woodard suffered abuse as a child. His mother was physically and emotionally abusive. (PSR at ¶ 191.) And Mr. Woodard was sexually abused by multiple people when he was a child, starting at age seven. (*Id.* at ¶ 198; Ex. 1, at p. 3.) He currently suffers from various mental health issues, including depression and extreme anxiety. (PSR at ¶ 201-04.)

Mr. Woodard is deeply remorseful for his actions and knows that he needs help, in the form of long-term treatment.

## II. LAW AND ARGUMENT

The Sentencing Guidelines recommend a sentence of life imprisonment. That advice is the product of a guideline, U.S.S.G. § 2G2.1, which courts have increasingly decided is unsound. This Court should decline to accept the advice of § 2G2.1 and should instead, in accordance with § 3553(a), impose a sentence commensurate to Mr. Woodard's crime and personal characteristics. Granted that crime was very bad and reflects a serious problem. But no one was killed nor were

2

Case 3:17-cr-00161    Document 44    Filed 01/13/20    Page 2 of 12 PageID #: 79

vast numbers of people harmed. Mr. Woodard is not the worst of all offenders, and he, by pleading guilty, has accepted responsibility. By the time he is in his seventies, his risk of recidivism will be very low. For these reasons, he submits that a sentence of 25 years, which is harsh by any standard, is sufficient but not greater than necessary to comply with the purposes of sentencing.

### A. The Guidelines' advice is plainly unsound.

As the Court is well aware, the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 264 (2005). Sentencing judges are not only free to disagree with how a guideline applies in a particular case, but they are also free to disagree with how a given guideline applies to cases in general. That is, courts can categorically reject a guideline based on a policy disagreement with the guideline, especially when the Sentencing Commission has failed to base that guideline on independent empirical study. *Spears v. United States*, 129 S. Ct. 840 (2009); *United States v. Kamper*, 748 F.3d 728, 741-42 (6th Cir. 2014) ("We have recognized courts' authority in appropriate cases to reject the Guidelines sentencing ranges based on articulated policy disagreements in a range of contexts.").

The guideline at issue here—§ 2G2.1, which addresses the production of child pornography—has sometimes been rejected by courts categorically. *United States v. Almazan*, 908 F. Supp. 2d 963, 970 (N.D. Iowa 2012); *United States v. Price*, 2012 U.S. Dist. LEXIS 38397, *33-34 (C.D. Ill. March 21, 2012). They have done so for two reasons. First, they have done so because § 2G2.1 is "not the product of empirical study by the Sentencing Commission" but rather it is the product of

3

political decrees from Congress. *Price*, 2012 U.S. Dist. LEXIS 38397 at *33-34. That is, it lacks a reasoned, expert, or empirical basis. Second, § 2G2.1's enhancements apply to such a large percentage of the offenders that the guideline winds up treating the vast majority of offenders as if they were all the worst of the worst. *Id.* That is, it fails to reasonably differentiate the many shades of gray amongst offenders, simply treating them all extremely harshly. *Id.* This Court, likewise, could reject § 2G2.1 categorically for these reasons.

Even when courts have stopped short of rejecting § 2G2.1 categorically, they have still shown increasing disagreement with it in particular cases. They have done so by declining its advice and by instead choosing a sentence below the advisory range. In fiscal year 2018, 60% of defendants under § 2G2.1 received a sentence below the guideline range absent a government-sponsored motion. (U.S. Sentencing Commission, Quarterly Data Report, at 18 (Sept. 2018) (277 out of 455 cases).) In light of these statistics, a Guidelines sentence would actually present a risk of unfair sentencing disparity.

### B. Mr. Woodard's addiction provides grounds for downward variance.

> For far too long, too many in our country have viewed addiction as a moral failing. This unfortunate stigma has created an added burden of shame that has made people with substance use disorders less likely to come forward and seek help. It has also made it more challenging to marshal the necessary investments in prevention and treatment. We must help everyone see that addiction is not a character flaw – it is a chronic illness that we must approach with the same skill and compassion with which we approach heart disease, diabetes, and cancer.

U.S. Dep't of Health and Human Services, Facing Addiction in America: The Surgeon General's Report on Alcohol Drugs, and Health (2016); *see also* National

4

Institute on Drug Abuse, Understanding Drug Use and Addiction (2016) (available at: https://www.drugabuse.gov/publications/drugfacts/understanding-drug-use-addiction). A person's environment, including "physical and sexual abuse, early exposure to drugs, stress, and parental guidance can greatly affect a person's likelihood of drug use and addiction." Sara Gordon, The Use and Abuse of Mutual-Support Programs in Drug Courts, Univ. of Illinois L. Rev., 1503, 1508 (2017). Like other diseases, alcoholism and drug abuse are influenced in large part by someone's biology, and tend to run in families. *Id.* at 1508.; see also Peggy Fulton Hora and Theodore Stalcup, Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts, 42 Ga. L. Rev. 717, 730 (2008) (noting that genetics constitutes one of "three major risk factors that predispose an individual for the disease of addiction").

An individual's addiction to alcohol or drugs is relevant at sentencing because it may render the defendant both less culpable for his actions and more amenable to change via treatment. *See, e.g., United States v. Hendrickson*, 25 F. Supp.3d 1166, 1171-75 (N.D. Iowa 2014) (explaining that addiction, in most cases, "mitigates a defendant's culpability" because it actually causes physical changes in the brain that impair a person's judgment and impulse control); *United States v. Martinez*, 802 F.Supp.2d 1251, 1256 (D.N.M. 2011) (concluding that guideline range was too high, given that the defendant "has a serious drug addiction" and "has begun to receive treatment for his addiction"); Patricia H. Brown, Considering Post-Arrest Rehabilitation of Addicted Offenders Under the Federal Sentencing Guidelines 10

5

Yale L. & Pol'y Rev. 520, 523 n. 22 (1992) ("The stronger the connection between the crime and the addiction, of course, the stronger the argument for consideration of rehabilitation from addiction as a relevant factor at sentencing.").

> The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender. . . . How does addiction affect culpability? The answer, at least in most cases, is that addiction mitigates a defendant's culpability. By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences.

*Hendrickson*, 25 F. Supp. at 1173–74.

Mr. Woodard suffers from addiction—a chronic disease sparked, in part, by a strong genetic predisposition and childhood trauma. As Dr. Walker's report explains in much more detail, meth is highly addictive and dangerous. (Ex. 1, at p. 2.) It had a substantial effect on his decision making and behavior at the time of his crimes. (*Id.*) Meth can also cause hypersexuality, which likely played a significant role in his behavior. (*Id.*)

Studies show that between 60 and 70% of meth users report drug induced increases in sex drive, obsession, and unusual sexual behaviors. Arnold Washton, A Vicious Cycle: Stimulant Drugs and Compulsive Sex, available at https://www.rehabs.com/pro-talk-articles/stimulant-drugs-and-compulsive-sex-how-to-break-the-cycle/ (citing Washton AM, Zweben ZE, Cocaine and Methamphetamine Addiction: Treatment, Recovery, and Relapse Prevention (2009)). Continued drug use can trigger sexual urges and compulsive sexual behaviors. *Id.* This was certainly the case for Mr. Woodard. (Ex. 1, at p. 2-3.)

Mr. Woodard's long-lasting struggle with addiction and his drug use at the time of the instant offense is grounds for a downward variance.

### C. The abuse that Mr. Woodard suffered as a child is further grounds for a downward variance.

Child sexual abuse can have a long-lasting effect on individuals like Mr. Woodard.

> Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words, child abuse and neglect "get under the skin" to have a profound and often lasting impact on development. Brain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward more problematic outcomes is impacted.

Institute of Medicine & National Research Council, New Directions in Child Abuse and Neglect Research 154 Social Science at Sentencing: An Annotated Bibliography (April 2018) (Anne Peterson et al. eds., 2013).

In fact, "childhood sexual abuse is uniquely destructive to long-term mental health outcomes." Jennie G. Noll, Sexual Abuse of Children—Unique in its Effects on Development?, 32 Child Abuse & Neglect 603, 603 (2008). Studies of the general population show increased risk of psychiatric illness associated with self-reported childhood sexual abuse. Elliot C. Nelson et. Al, Association Between Self-Reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes, 59 Archives Gen. Psych. 139, 139 (2002). These illnesses manifest as anxiety disorders, depression, substance abuse, eating disorders, conduct disorders, borderline personality disorder, suicide attempt, revictimization, and relationship problems. *Id.* The link

7

between childhood abuse and maldevelopment is "above dispute," and research suggests that neurological development is adversely impacted by childhood sexual abuse. Noll, *supra* at 604; *see also, generally*, Susan L. Andersen et al., Preliminary Evidence for Sensitive Periods in the Effect of Childhood Sexual Abuse on Regional Brain Development, 20 J. Neuropsychiatry & Clinical Neuroscience 292 (2008).

While female victims of sexual abuse tend to internalize the effects of abuse (e.g., depression and eating disorder), male victims of abuse tend to exhibit negative externalized behavior, such as delinquency, violence, or alcohol abuse. Gail Hornor, Child Sexual Abuse: Consequences and Implications, 24 J. Pediatric Health Care 358, 359–60 (2010). Other examples of externalized coping among men sexually abused as children include aggression, antisocial behavior, and a lack of control over behavior. G. K. Dhaliwal et al., Adult Male Survivors of Childhood Sexual Abuse: Prevalence, Sexual Abuse Characteristics, and Long-Term Effects, 16 Clinical Psych. Rev. 619, 627 (1996). Research has shown that groups of sexually abused men exhibit post-traumatic stress disorder at ten times the rate of control groups. Patrick J. O'Leary, Men Who Were Sexually Abused in Childhood: Coping Strategies and Comparisons in Psychological Functioning, 33 Child Abuse & Neglect 471, 478-79 (2009).

The abuse that Mr. Woodard experienced as a child most likely made him more susceptible to the mental health issues he has faced as an adolescent and as an adult. (Ex. 1, at p. 3.) His addiction and criminal behavior most likely both stem

8

at least in part from unaddressed early childhood trauma that he experienced. This is grounds for a variance below his advisory guideline range.

### D. Deterrence does not require a life sentence for Mr. Woodard.

Deterrence is of course of great importance in sentencing an offender for this type of offense. With age, Mr. Woodard's risk of recidivism should decline. Currently age 42, with the 25 year sentence he requests, he would not be released until he is his mid-sixties where his risk of reoffending is minimal. All of the evidence indicates that the risk of sexual recidivism declines with age. Even for child molesters released after age 60, the recidivism rate is very low (3.8%). *See* R. Karl Hanson, Recidivism and Age: Follow–Up Data From 4,673 Sexual Offenders, 17 J. Interpersonal Violence 1046, 1059 (2002).

At whatever age, Mr. Woodard will be subject to highly restrictive conditions of supervised release that will minimize the chance he is ever again in a position to commit the kinds of crimes he did before. Under these restrictive conditions, he should be sober, denied access to any sexual materials, and publicly identified as a sex offender who is, moreover, denied contact with minors. These conditions should greatly reduce the already small risk of recidivism.

Finally, Mr. Woodard's risk of reoffending will be even lower if he receives sex offender treatment during his time in custody and while on supervised release. *See, e.g.,* Grant Duwe & Robin A. Goldman, *The Impact of Prison-Based Treatment on Sex-Offender Recidivism: Evidence from Minnesota*, Sexual Abuse: A Journal of Research and Treatment, vol. 21, No. 3 (September 2009) (confirming effectiveness

of cognitive-behavioral treatment for sex offenders in prison setting). The majority of studies analyzing the effectiveness of sex offender treatment have confirmed its benefits. Studies report, for example, that treated sex offenders have a sexual recidivism rate 37% lower than control groups receiving no treatment. Friedrich Losel & Martin Schmucker, *The Effectiveness of Treatment for Sexual Offenders: A Comprehensive Meta-Analysis*, Journal of Experimental Criminology, at pp. 127-28 (2005). Mr. Woodard recognizes that he engaged in horrible conduct, he is deeply remorseful, and he is open to participation in treatment.

### E. To acknowledge Mr. Woodard's acceptance of responsibility and to provide just punishment, the sentence must allow for release within his life expectancy.

Mr. Woodard admitted his culpability. He provided inculpatory statements to law enforcement. He did not contest any search conducted in this case. Yet, even with a full three-level reduction for acceptance of responsibility, the recommended sentence in the presentence report is still the same effective sentence to die in prison that would have been achieved if Mr. Woodard denied responsibility, invoked his constitutional right to trial, and required the government to call its witnesses to prove its case.

To ensure that a sentence satisfies 3553(a)'s goal of ensuring "just punishment," it is appropriate to account for the defendant's acceptance of responsibility, and to consider the defendant's age and whether a sentence affords him any prospect of release before he dies. *See United States v. Moreland*, 568 F. Supp. 2d 674, 687 (S.D. W.Va. 2008) (explaining that goals of just punishment and

10

rehabilitation cannot be served unless the defendant has a realistic expectation of surviving his term of imprisonment and rebuilding his life upon release). The life sentence recommended in the presentence report will obviously ensure that Mr. Woodard dies in prison.

"Life without parole sentences share some characteristics with death sentences that are shared by no other sentences." *Graham v. Florida*, 560 U.S. 48, 69 (2010). A sentence that denies the convict any "realistic opportunity to obtain release before the end of [its] term" thereby deprives "the convict of the most basic liberties without giving hope of restoration," and it "means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Id.* at 69-70, 82 (internal punctuation and citations omitted). Such life sentences should be reserved for murderers. "Serious non-homicide crimes may be devastating in their harm but in terms of moral depravity and of the injury to the person and to the public they cannot be compared to murder in their severity and irrevocability." *Graham*, 560 U.S. at 69 (internal punctuation and citations omitted). Thus, "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.*

Here, Mr. Woodard has accepted responsibility for committing these acts. He should receive some benefit for accepting responsibility and is not deserving of a life sentence with no hope for release, even as an old man.

11

### III.  CONCLUSION

Mr. Woodard has admitted his crime and pled guilty. Because he recognizes that he must be punished harshly, he has agreed to ask for what is truly a very harsh punishment, 25 years. He respectfully asks that the Court impose such a sentence, recognizing that he is not the worst of offenders and that he has the potential to be rehabilitated.

Respectfully submitted,

*s/ R. David Baker*
R. David Baker (BPR# 014238)
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203

Attorney for Cecil Clint Woodard

### CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2020, I electronically filed the foregoing *Sentencing Memorandum for Cecil Clint Woodard* with the U.S. District Court Clerk by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: S. Carran Daughtrey, Assistant United States Attorneys, 110 Ninth Avenue South, Suite A961, Nashville, TN 37203, and to United States Probation Officer Deborah Lochmaier. A-725 U.S. Courthouse, Nashville, TN 37203.

*s/ R. David Baker*
R. DAVID BAKER
Assistant Federal Public Defender