IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,    )
                             )
v.                           )        Case No: 3:17-cr-00161
                             )        Judge Richardson
CECIL CLINT WOODARD          )

UNITED STATES' SENTENCING MEMORANDUM

The United States of America requests this Court impose a substantial sentence of incarceration for Cecil Clint Woodard's egregious conduct. Not only did this defendant molest and produce sexually explicit images of a three-year-old girl, who was in his custody and control, during at least fourteen different sessions, but he also distributed these recordings to strangers, talking to them about his sexual molestation of this child and offering other children for sex in return for money. This defendant is a dangerous predator who has adversely affected the life of two children and their respective families, distributed images of at least one of these young children, and offered minors for sex to strangers online in exchange for money. Woodard should not be given the opportunity to engage again in such despicable behavior. An effective life sentence is a sufficient but not greater than necessary sentence that reflects the goals of 18 U.S.C. § 3553(a).

Background

As reflected in the presentence report ("PSR"), in early 2016, defendant Cecil Clint Woodard was living with his parents, who babysat a three-year-old girl on a regular basis. Woodard himself had exclusive custody and control of that three-year-old child at times, as early as April 6, 2016, and periodically thereafter, until he was arrested on June 11, 2016. During the time he had exclusive custody and control of the child, he recorded himself abusing her on at least

1

fourteen different occasions, producing over 300 images and 20 videos of child sexual abuse for his own sexual gratification.[1] PSR ¶¶ 14, 15, 16. In a number of images and videos, the defendant is inserting at least the tip of his penis into the child's vagina and anal cavity. See, for example, IMAG0970, IMAG0971, IMAG1347, IMAG1458, VIDEO0053, VIDEO0069, and VIDEO0074 (described in PSR ¶ 16, Counts 2, 10, 14).[2] In another series of images, the defendant recorded the child from the back, showing her bare bottom, her hands cuffed behind her back, and her body poised in a sexually suggestive manner. See, for example, IMAG1219, et seq. (described in PSR ¶ 16, Count 7). Another set of images depicts this three-year-old child with the defendant's penis in her mouth. PSR ¶ 15. See, for example, IMAG1140, IMAG1141, and IMAG1143 (described in PSR ¶ 16, Count 6). Finally, at least one image shows Woodard digitally penetrating the child's vagina. See IMAG1405 (as described in PSR ¶ 16, Count 11). The defendant, however, is insisting that he did not penetrate the child, stating that he only had his penis underneath the child and held the camera at an angle that only suggested penetration. PSR ¶ 19. He further down plays the seriousness of his recording images of this child with his penis in her mouth by claiming he only made her do that long enough to take pictures and that he bribed her with promise of a toy. PSR ¶¶ 18, 19. Finally, the defendant minimizes the other child abuse material by insisting that the child was asleep. PSR ¶ 19. While many children feign sleep in such circumstances, the state of sleep does not diminish the severity or impact on the child. Because of the defendant's denial of penetration and minimization of other recordings, the produced images and videos will be entered as exhibits during the sentencing hearing.

---

[1] While there was more than one session on four of the days listed in the indictment, each of the sessions was discrete, and they all were separate from each other by at least one hour if not more.
[2] VIDEO0069 and VIDEO0074 are not described in the PSR but are further evidence in support of Counts 11 and 12.

2

Woodard, however, did not stop his criminal activity after producing numerous child abuse images and videos. Instead, he distributed them online to multiple strangers, as charged in Counts 15 to 20. PSR ¶ 16. Because Woodard distributed these sexually explicit recordings, several of which include the child's face, they will be online for eternity, likely haunting this child throughout her life. In these online communications, he also reported that that he had been sexually active with the three-year-old child for several months and that he had been sexually active with another twelve-year-old girl since she was nine years old. PSR ¶ 12. Finally, in some of these online communications, he offered these two children for sex in exchange for money. While it does not appear that he followed through with any of these offers, they clearly show his view of children as sex objects, commodities from which he might be able to profit.

Woodard also possessed a number of images and videos of child exploitation material of children other than the three-year-old girl. He acknowledged that he used his girlfriend's email address to pretend to be a 15 to 16 year old male, in an effort to collect additional images of minors. PSR ¶ 21.

Woodward, however, minimizes his criminal activity. For example, he claims that the drugs caused him to think about "child pornography" and stated that he was using drugs on the approximately three times he took pictures of this child, minimizing the extent of the abuse. PSR ¶ 22. His claim that he only perpetrated the sexual abuse three times is belied by the metadata that shows he made these recordings on at least seven different days in at least fourteen separate sessions. The evidence further indicates that he engaged in the same kind of child sexual abuse of another child for approximately three years, beginning when she was nine years old. PSR ¶ 12. After Woodard's arrest, the older child was forensically interviewed and reported that the defendant had come into her room multiple times, pulled down her pants to expose her vagina,

3

took pictures of her genitalia, touched her "private parts and boobs," asked her to touch his penis, and told her he would kill her and her family if she told. PSR ¶ 24. The defendant, of course, self-servingly denies touching her or telling her he would kill her and her family if she told anyone. PSR ¶ 24, n. 7.

The three-year-old child's mother, who had entrusted the care of this toddler to Woodard and his parents, was entirely unaware of Woodard's conduct until after his arrest. She was devastated to discover what had happened to her daughter and will likely deliver a victim impact statement at the sentencing hearing.

<u>Appropriate Sentence</u>

This Court is now tasked with imposing a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §3553(a)(2). The United States submits that consideration of these factors as a whole supports a sentence that ensures this defendant never has the opportunity to abuse another child, given the egregious nature of the defendant's criminal behavior and the dire results for the sexually abused children and their families. A sentence of 120 years of imprisonment, which is an effective life sentence, would accomplish the goals set out in 18 U.S.C. § 3553(a).

I.      <u>Nature of the Offenses</u>, 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), this Court should consider the nature and circumstances of these offenses. The Eleventh Circuit, sitting *en banc*, has held that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). Production of child exploitation material,

4

particularly with such a young child, is a heinous crime that can have long or life-lasting effects on a child and the child's family, especially when the recording accompanies the repeated sexual penetration of the child. Furthermore, the online distribution of these recordings perpetuates the abuse as images and videos can never be recovered. As this child grows older, she is likely to wonder how many people have seen these humiliating images and videos or if anyone recognizes her. Other victims who images have been distributed widely have expressed long-term anxiety knowing that their images are being shared with reports of significantly negative effects on their lives, particularly when they venture out into public.

Scientific studies have shown how childhood trauma can negatively affect a person. In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18, including contact sexual abuse, verbal abuse, physical abuse, a battered mother, household substance abuse, household mental illness, and parental separation or divorce. The survey data was collected in 1995-1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009) (attached as Exhibit #1). In other words, if a person in the control group lived to 79.1 years old, that same

person will only live to age 60.6 years old if he experienced six or more ACEs before the age of 18. This statistic is shocking, and yet the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." *Id*. at 394 (emphasis added). Indeed, when the initial survey was conducted in 1995-1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be institutionalized; or be otherwise lost prior to the initiation of the ACE Study." *Id*. at 394-95. In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." *Id*. at 394. Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." *Id*. at 395. In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering "yes" to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult men, who were sexually abused in the form of intercourse as a child, were *240% more* likely to attempt suicide than men

6

who had never been sexually abused as a child. *See id*. at 432, Table 4. Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include *actual* suicides, which undoubtedly would increase the odds described in the study.

The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse. This three-year-old girl, who were exposed to repeated sexual abuse by Woodard, now has a significantly increased risk of attempting suicide, using illicit drugs, and developing alcohol problems. Finally, there is an increased chance that this child may die 20 years early, all because the defendant repeatedly chose to use her as a sexual object for his own base gratification and the gratification of countless others who received depictions of this abuse. In short, the defendant has forever affected this child's life in ways that have significant long-term health consequences, and thus his abuse of this child will redound to her detriment in profound ways. Therefore, a sentence of that amounts to life would be both reasonable and appropriate—"just punishment" in § 3553(a) language—given the lifelong consequences this child, and possibly other victims of Woodard, will likely experience due to the defendant's repeated and reprehensible acts.

II.    Defendant's History and Characteristics, 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), this Court also should consider the defendant's history and characteristics. In this case, the defendant's parents were entrusted to babysit this very young child and allowed their son to have exclusive access to her. While in control of this child, who was barely verbal and unlikely to be able to report what was happening to her, Woodard recorded his

7

rape of her on multiple occasions. While Woodard has no prior sex offender convictions (he does have a significant record for other crimes), his rape and abuse of this child occurred at least 14 times over a period of about three months. Given the severe nature of his actions, common sense tells us that the defendant's sexual interest in children and this kind behavior did not occur for the first time on April 6, 2016, when the defendant was 38 years old, but likely happened long before April 2016. That sexual interest in children will not magically disappear after he serves his time.

The defendant, however, seeks to mitigate his culpability and the severity of this crime in two ways, first attributing his criminal behavior to his use of methamphetamine. He told the officers who interviewed him that he used the drug once or twice every few weeks, including the times he produced child sex abuse images and videos of the three-year-old girl. PSR ¶ 22. He later has admitted to using the drug daily for years. PSR ¶ 205. While the United States understands the defendant's struggle with drug addiction and that it might often be a mitigating factor in other circumstances, it poses more of a problem with a case involving the severe sexual abuse of a child. In fact, the defendant's addiction likely makes his exposure to children even more dangerous if he is unable to resist his urge to rape them.

The defendant also claims that he was sexually abused as a child prior, implying that had he not been abused in childhood, he probably would not have committed these crimes. For purposes of the presentence investigative report, Woodard claimed that a friend's uncle abused him and three other boys once a week for 6 years, yet his mother was unable to confirm this. PSR ¶¶ 191, 198. These allegations are in stark contrast, however, to what he told his father from jail on June 30, 2016: that he was abused by some of the neighborhood boys when he was young but admitting that he didn't know whether that contributed to his abuse of this little girl. It is unclear

whether the defendant only made these claims after his arrest, but they certainly have not been confirmed via polygraph or other records.

Nevertheless, reliance on this explanation for abusing this young child should carry little weight. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation…" Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in *Sex Abuse: A Journal of Research and Treatment* 14(1) (2002) at 43. *See also* Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who Were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."). Moreover, with respect to studies that have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy." *Glasser*, at 488. *See also* Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464 (noting that "[t]here is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements often are made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., "Cycle of Abuse and

Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents" in *Child Abuse & Neglect* 20(12) (1996) at 1234 (stating that "[s]tudies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child. Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); and Briggs & Hawkins, at 232 (noting that "[p]erpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers)."). Interestingly, "when verified by polygraph…the percentage of offenders who experienced sexual victimization in their own lives drops significantly." Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in *The Sexual Predator* (vol. IV) (2010) at 20-5. *See also* Hindman, Jan et al., "Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders" in Federal Probation 65(3) (2001) at 8.

In this case, however, the defendant's allegations have not been subjected to a polygraph, and even the defendant's mother stated she could not confirm the defendant's claims of having been sexually abused as a child. PSR ¶ 191. As such, this defendant's unverified report as a victim of prior sexual abuse should be given little weight. Even if this Court were to consider the childhood abuse, such experiences, while clearly unfortunate and disturbing, simply should not mitigate the later abuse of children. *See, for example, United States v. Grigsby*, 749 F.3d 908, 909 (10th Cir. 2014) (upholding a 260-year sentence, discounting the defendant's difficult childhood as outweighed by the harm he had caused).

10

While the defendant's addiction and abuse history (assuming it is accurate) are unfortunate and may be considered as mitigating factors, they simply do not outweigh the seriousness of his crimes and the need for a substantial sentence.

III.     <u>Need for Sentence Imposed to Reflect the Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>, 18 U.S.C. § 3553(a)(2)(A)

In determining the appropriate sentence, this Court also should consider, pursuant to 18 U.S.C. §3552(a)(2), the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The 25-year sentence suggested by the defendant, however, simply would not reflect the seriousness of these offenses. Nor would such a sentence promote respect for the law or provide just punishment for a man who has molested a very young child in his custody, produced sexually explicit material of that child, distributed that material, discussed his molestation of children, offered children for sex in exchange for money, and collected recordings of the sexual exploitation of other very young minors. A sentence of at least 120 years, however, would accomplish the goals of reflecting the seriousness of these crimes, promoting respect for the law, and providing a just punishment.

IV.     <u>Affording Adequate Deterrence to Criminal Conduct</u>, 18 U.S.C. § 3553(a)(2)(B)

Given that collection of child exploitation material has become so prevalent, it is imperative that a sentence be imposed for the *production* of sexually explicit material that will afford adequate deterrence to such criminal conduct and will promote future lawful conduct, pursuant to 18 U.S.C. § 3553(a)(2)(B). Indeed, Congress, the Supreme Court, and the Sentencing Commission believe that general deterrence for trafficking in child exploitation material is a very important factor when considering an appropriate sentence in distribution, receipt, and possession

11

cases. *See United States v. Irey*, 612 F.3d 1160, 1210-11 (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982); *Osbourne v. Ohio*, 495 U.S. 103, 109-10 (1990) (holding that "[i]t is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand")); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (stating that "[t]ransporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it."); *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) (noting that "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced"). In *United States v. Bistline*, the Sixth Circuit reversed the district court for failing to see any importance in general deterrence for a defendant who had collected child exploitation material. 665 F.3d 758, 767 (6th Cir. 2012). The district court in that case stated, "general deterrence . . . will have little [if] anything to do with this particular case." *Id.* The Sixth Circuit found that the district court's statement was "inexplicable and in any even conflicts with our statement that 'general deterrence is crucial in the child pornography context.'" *Id.* (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

In this case, however, the defendant not only collected child exploitation material, but he also produced and distributed the child sex abuse images, behavior that warrants even greater deterrence. The defendant's multiple recordings of his raping this very young girl are abhorrent. Under these circumstances, it is important that the sentence in this case provide a deterrent for *this* defendant. Additionally, a sentence of 120 years would provide a generic deterrence by sending a

12

strong message to the community that the recording and distribution of the sexual assault of very young children will be punished harshly.

V.     Protection of the Public from Further Crimes of Defendant, 18 U.S.C. § 3553(a)(2)(C)

In determining the appropriate sentence, this Court also must consider the need to protect the public from further crimes of the defendant, pursuant to 18 U.S.C. § 3553(a)(2)(C).  In this case, the defendant produced exploitive material of a very young child on at least 14 occasions. He discussed his sexual exploitation of this child and others, and he distributed the material, some of which has been identified in another offender's collection. Woodard also distributed this material in exchange for sexually explicit materials of equally young children. These factors are indicative of the serious danger this man presents to the community. He should be sentenced to a sufficiently long sentence that he will never again have the opportunity to abuse another child.

In his discussion of public safety and deterrence, the defendant argues that this Court should consider recidivism, stating that age is a factor that affects recidivism and citing a couple of studies. Focusing on "recidivism rates," however, is misleading for a number of reasons. The reality is that sex offenders can perpetrate sexual abuse throughout their life, even as they grow older. *See, for example, United States v. Hans Bartsch*, 3:10-cr-00300, Middle District of Tennessee (involving 72-year-old man traveling from Canada to have sex with a fourteen-year-old girl in Tennessee). Additionally, relying on recidivism rates as an indicator of future risk depends on crimes being reported and successfully prosecuted. The United States Sentencing Commission, Report to Congress: Federal Child Pornography Offenses (Dec. 2012),[3] has reported

---

[3] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm.

that recidivism rates "necessarily underreport offenders' actual rate of recidivism," since they are based on arrests and/or convictions. (Sent. Comm. Report, p. 294). Even when recidivism is based on convictions and/or arrests, the rates tend to increase over time. *See, for example*, Ecke, Seto, and Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow up Study*, Law and Human Behavior (2011), 466-478 (concluding that the longer a child exploitation offender is in the community, the greater the likelihood that he will be caught reoffending). In fact, the low levels of arrest rates should not be surprising. Unlike other offenders, child molesters do not boast about their crimes outside of their trusted circles. Furthermore, the vast majority of sex offenses committed against children go unreported. *See* London, Bruck, Ceci and Schuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, Journal of Psychology, Public Policy, and Law, Vol. 11, No. 1, p. 194 (2005) (reviewing numerous studies and concluding "[t]he evidence indicates that the majority of abused children do not reveal abuse during childhood"); Sent. Comm. Report, p. 295 (reporting that sex offenses are underreported as "it is widely accepted among researchers that sex offenses against children often go unreported or undetected"); Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)) (finding that children are particularly reluctant to talk about sexual abuse); Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)). One study aimed specifically at age and sexual recidivism offered the following explanation for the data upon which defendant relies:

> The abrupt drop in recidivism for offenders released in their 60s and 70s might then reflect new variables beginning to act. These might include loss of physical health and a significant reduction in effective time at risk due to mortality. However, some reckoning must also be made with possible changes in the reporting rate. Relatives'

14

willingness to report offending by a grandparent is likely reduced by the thought that he will probably die soon. Additionally, sexual misbehavior by the very old (for example in nursing homes) is often treated as a health problem ("poor old man, he can't help it") rather than as something to be dealt with by the criminal justice system.

Thornton, *Age and Sexual Recidivism: A Variable Connection*, Sexual Abuse: A Journal of Research and Treatment, Vol 18, No. 2, p. 12 (2006). Thus, low recidivism numbers based upon arrests and convictions are to be expected in all sex offense cases, and especially those involving older offenders. Interestingly, when compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders. See Ryan C.W. Hall & Richard C.W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 458 (2007). As Judge Posner has explained:

> Statistical analysis of sex crimes has shown that *the best predictor of recidivism is not deportment at an interview but sexual interest in children*. R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1).

*United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (emphasis added). The bottom line is that recidivism rates and statistics simply cannot representative of the danger offenders pose to the community.

Importantly, the re-offense rate (as opposed to the recidivism rate, which only tracks rearrests at best) of child sex offenders is not insignificant, according to a variety of different studies. Recidivism and Reoffense Rates of Adult Sex Offenders, Stephen Brake, Ph.D. (September 2012). Indeed, the risk is higher for those who have prior contact offenses. The United States Sentencing Commission Report indicates that offenders such as Woodard are more likely

15

to recidivate than others convicted of non-contact child exploitation offenses. Specifically, the Report cites to a study that states as follows:

> "A pedophilic sex offender who has committed both a child –pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has committed only a child-pornography offense." Drew A. Kingston et al., *Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism Among Sexual Offender*s, 34 AGGRESSIVE Behav.1, 9 (2008).

(Sent. Comm. Report, p. 170). In this case, Woodard sexually abused a very young child (age 3) and another child for approximately 3 years beginning when she was nine years old. He also discussed the abuse he had inflicted, distributed his homemade material, offered children for sex in exchange for money, and collected additional child exploitation materials. Clearly, based on these studies cited by the Commission, Woodard is at a higher risk to recidivate than is represented by James Walker, who is deceased and thus not available for cross examination, who had an addiction problem of his own that led to the suspension of his license, and who was found to be not credible in Judge Todd Campbell's court in a child exploitation case involving receipt and possession, *United States v. Gary Olivas*, 3:09-cr-00201.[4]

In summary, there is no doubt that this defendant is an immense danger to the community, particularly with regard to children. As such, a sentence of 25 years would not come close to achieving the sentencing goal of protecting the public.

---

[4] In the sentencing hearing for the *Olivas* case, Walker watched a video recorded by the defendant of himself bouncing a young girl on his lap and then turning her upside down and smelling her crotch repeatedly. Walker testified that the video did not alter his view of the defendant's risk to children, basing his conclusion on the simple fact that the defendant had not been convicted of that conduct.

16

VI.    Sentencing Guideline Range, 18 U.S.C. § 3553(a)(4)

This Court also should consider the advisory sentencing guidelines in determining the appropriate sentence, pursuant to 18 U.S.C. § 3553(a)(4). The total offense level is 53 after acceptance of responsibility, which is treated as level 43, pursuant to U.S.S.G. § 5A, application note 2 (stating that in rare cases where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43).[5] Notably, not only is this a "rare" case in which the total offense level is above 43, but it is 10 levels above the maximum level even after acceptance of responsibility. Even without the criminal category of VI, the resulting advisory guideline range is life, although it is limited by the statutory maximum of 560 years.

The defendant suggests that this Court should disregard the guideline range and impose a sentence of only 25 years. As part of his argument, the defendant criticizes the sentencing guidelines as they relate to the production of child abuse material, arguing that they lack a reasoned, expert, or empirical bases, and because the guideline enhancements apply to such a large percentage of offenders that everyone is treated as if they are the worst offender. D.E. 44: Defendant's Sentencing Memorandum, at 3-4. In support of his argument that the Court should disregard U.S.S.G. §2G2.1, the defendant cites two district court cases, both of which are outside the Sixth Circuit. In contrast, the Sixth Circuit has held that sentencing judges must give child exploitation guidelines substantial deference:

> Congress's power to make sentencing policy does not arise from a delegation from anyone, much less a delegation made on grounds of a particular expertise. That power flows directly from the Constitution, without strings other than those contained in the Constitution itself. And nothing in that document confines the exercise of Congress's sentencing power to empirical grounds alone. Of course, Congress can choose to act on empirical grounds; and when it does, a district court

---

[5] While the defendant has disputed the guideline calculations, the United States believes that the calculations are correct and will be filing a response to the defendant's sentencing position in a separate filing.

must contend with those grounds in explaining its disagreement (in the case of a guideline) with Congress's policy judgment. But it is also Congress's prerogative to dictate sentencing enhancements based on a retributive judgment that certain crimes are reprehensible and warrant serious punishment as a result. When a congressional directive reflects such a judgment, a district court that disagrees with the guideline that follows must contend with those grounds too. Thus, when a guideline comes bristling with Congress's own empirical and value judgments—or even just value judgments—the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*.

. . . .

A court that disagrees with § 2G2.2 must take on this formidable task. Congress's long and repeated involvement in raising the offense levels for § 2G2.2 makes clear that the grounds of its action were not only empirical, but retributive—that they included not only deterrence, but punishment.

*United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012) (rejecting the district court's conclusion that the § 2G2.2 was "seriously flawed" because Congress exercised, rather than delegated to the Sentencing Commission, its power to set policies, and finding instead that the guidelines range was the proper starting point for Bistline's sentence). While the Sixth Circuit appears to have addressed only the § 2G2.2 guidelines, which apply to the possession, receipt, distribution, and transportation of child exploitation materials, application of this reasoning makes even more sense in production cases that involve the most culpable child exploitation offenders. Indeed, other circuit courts have rejected challenges to § 2G2.1 for lacking an empirical basis. *See, for example, United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014); *United States v. Miller*, 665 F.3d 114, 121 (5th Cir.2011). In the instant case, this defendant has failed to set forth any substantial support for why this Court should disregard the advisory guideline under § 2G2.1 other than to argue that it is not based on "empirical" data and that § 2G2.1 does not differentiate between offenders.

Even if this Court were to disregard Sixth Circuit precedent and/or buy into this defendant's other arguments, the factors pursuant to 18 U.S.C. § 3553(a) still warrant a sentence commiserate

with the advisory guidelines and certainly more than the 25 years that the defendant argues is appropriate. The United States is not seeking a guideline sentence of 560 years, but does submit that a sentence that is effectively life, such as 120 years, would best satisfy the goals of 18 U.S.C. §3553(a).

VII.    Disparity in Sentencing, 18 U.S.C. § 3553(a)(6)

Defendants who have been charged in this jurisdiction with production of child sexual abuse material involving hands-on offenses of prepubescent children and have pleaded guilty, have routinely received lengthy sentences that have been upheld on appeal. *See United States v. Jarratt Turner,* 750 Fed. Appx. 472 (6th Cir. 2019) (upholding 105-year sentence for a defendant who pleaded guilty to producing child abuse material of two very young children); *United States v. Daniel Green*, 608 Fed.Appx. 383 (6th Cir. 2015) (upholding 80-year sentence, the maximum possible sentence in the case, when a defendant pleaded guilty mid-trial after producing child exploitation material of two young girls in his custody); *United States v. Richard Souders,* 747 Fed. Appx. 269 (6th Cir. 2018) (upholding a 60-year sentence for defendant who pleaded guilty to production of child exploitation materials of a 17-month-old relative and subsequent distribution to multiple individuals); *United States v. Edwin Velasquez Curuchiche*, MDTN 17-5566 (6th Cir. February 23, 2018) (unpublished) (affirming 55-year sentence after defendant pleaded guilty to production of child exploitation material depicting the lascivious exhibition of genitalia of a six year old neighbor child while sleeping, having snuck into the child's house uninvited; no distribution involved); *United States v. Ryan Day*, MDTN 3:15-cr-00197 (appeal pending, case #17-5866) (upholding a 50-year sentence for a defendant who pleaded guilty to production of child exploitation material of a child in his care whom he also molested her for several years until he

19

was caught when she was about 11 years old; involved distribution of produced child exploitation material); *United States v. Damion Faulkner*, 926 F.3d 266 (6th Cir. 2019) (upholding a 47.5 year sentence for a defendant who pleaded guilty to one count production of child exploitation material depicting the lascivious exhibition of genitalia of a 5-year-old child while sleeping and one count of attempted and who also had molested another 5-year-old girl; involved distribution of produced child exploitation material). See also *United States v. Mark White*, MDTN 3:13-cr-00138 (received 35-year sentence for production of child exploitation material depicting the lascivious exhibition of genitalia of prepubescent child while sleeping; no distribution involved; no appeal filed).

While defendant Woodard cites statistics that courts have declined to impose guideline sentence for cases under U.S.S.G. § 2G2.1, many of those cases are similar to the majority of those in this district in which the court has not imposed a guideline sentence of 500 or more years but has imposed an effective life sentence, as demonstrated above. Indeed, many defendants in other jurisdictions with facts similar in nature have received much higher sentences that have been upheld on appeal, despite the sentences being the equivalent of life sentences. *See, for example, United States v. James Edward Stull*, WDPA #16-00125 (on appeal) (received a sentence of 338 years after pleading guilty to a 41 count indictment charging production of images and videos, of his rape of his child from age 23 months to years old, and distribution of the produced material); *United States v. Grigsby*, 749 F.3d 908, 909 (10th Cir. 2014) (upholding a 260-year sentence by giving the maximum sentence on each count, run consecutively, when the defendant produced child exploitation material of his daughter over the course of 3 months; recognizing the emotional damage the defendant caused his victim, the antisocial behavior defendant had engaged in over the course of his life, and the public's need for protection from him; and discounting the defendant's difficult childhood as outweighed by the harm he had caused); *United States v. Williams*, 2013 WL

20

6851125 (11th Cir. Dec. 31, 2013) (unpublished) (affirming 100 year sentence); *United States v. Goodale*, 2013 WL 6847032 (8th Cir. Dec. 30, 2013) (finding life sentence reasonable for defendant who sexually abused two boys); *United States v. Hamilton*, 2013 WL 6726953 (2d Cir. Dec. 23, 2013) (unpublished) (affirming 150-year sentence after defendant pleaded guilty to 5 counts of production of child exploitation material, stating, "Nor are we persuaded that a life sentence in the case at bar overstates the seriousness of the offense given Hamilton's role in producing graphic child exploitation material by filming himself sexually abusing children as young as four years old."); *United States v. Hodge*, 729 F.3d 717 (7th Cir. 2013) (finding 115-year sentence reasonable for production and other child exploitation crimes, including the abuse of a 9 year-old girl); *United States v. Herrick*, 2013 WL 275908 (6th Cir. Jan. 25, 2013) (unpublished) (finding 95-year sentence reasonable for three counts of production of child exploitation material for a Boy Scout camp director); *United States v. Boroczk*, 2013 WL 197709 (7th Cir. Jan. 18, 2013) (finding 70 year sentence for production was reasonable); *United States v. Cannon*, 703 F.3d 407 (8th Cir. 2013) (affirming a sentence of 70 years for sexual exploitation of a child); *United States v. Miller*, 2013 WL 4256278 (5th Cir. Aug. 12, 2013) (unpublished) (upholding 70-year sentence for production and possession); *United States v. Demeyer,* 665 F.3d 1374, 1375 (8th Cir. 2012) (affirming the reasonableness of a 120-year sentence, noting that the district court had not abused its discretion in running sentences consecutive to ensure that the defendant would serve a life sentence); *United States v. Snyder*, 425 Fed. Appx. 64 (2d Cir. 2011) (upholding a 75-year sentence for 5 counts of production of child exploitation material as substantively reasonable); *United States v. Castillo*, 2011 WL 2014943 (11th Cir. 2011) (upholding a sentence of 130 years for 4 counts of production of child exploitation material and one count of possession of child exploitation material as substantively reasonable); *United States v. Noel*, 581 F.3d 490, 500-01 (7th Cir. 2009)

21

(affirming an 80-year, below-guideline sentence for production and possession of child exploitation material); *United States v. Sarras*, 575 F.3d 1191, 1219-21 (11th Cir. 2009) (affirming as reasonable a 100-year sentence for a first-time offender who sexually abused a 13-year-old girl and produced pornographic images of the victim); *United States v. Johnson*, 451 F.3d 1239 (11th Cir. 2006) (upholding as reasonable a 140-year sentence for two counts of producing child exploitation material and one count of distribution); *United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five 8- to 11-year-old girls, including two of his granddaughters); *United States v. Johnson,* 451 F.3d 1239, 1244 (upholding the reasonableness of a 140-year sentence, within-guidelines sentence for production and distribution of child exploitation material).

Woodard is deserving of an effective life sentence, given that he molested and produced sexually explicit material of a three-year-old girl, distributed the material online, and molested another child from age 9 to 12. Indeed, imposing an effective life sentence, such as 120 years of incarceration, for this egregious of conduct would avoid disparate sentencing.


Conclusion

This is a case in which the defendant deserves a sentence that is tantamount to life, so that he can never again engage in the rape of children. Although the defendant has not murdered someone, which he submits in the only crime deserving of life, his crimes are likely to affect the two victims in a negative way for the rest of their lives, which may well be shorter in duration than a normal life expectancy because of the trauma. Federal District Judge John R. Adams, in *United States v. Cunningham*, used a quote attributed to Nelson Mandela: "There can be no keener

revelation of a society's soul than the way in which it treats its children." 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010). He continued, "[g]iven the recent statistics surrounding child pornography, we are living in a country that is losing its soul." *Id.* The defendant's request for a downward variance in this case ignores the public's revulsion and horror at the thought of someone with custody of a very young, vulnerable child sexually abusing that child, recording it, and trading it for additional child exploitation images.

In conclusion, the United States request the defendant be sentenced to 120 years, which is already a significant downward variance from the guideline sentence of 560 years, followed by supervised release for life. Such a sentence would be sufficient but not greater than necessary to comply with the goals enumerated in 18 U.S.C. §3553(a), including the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of this defendant.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

s/ S. Carran Daughtrey
S. Carran Daughtrey
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: (615) 736-5151

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the above styled pleading with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: David Baker, Assistant Federal Public Defender, 810 Broadway, Suite 200, Nashville, TN 37203, on this, the 13th day of January 2020.

s/ S. Carran Daughtrey
S. Carran Daughtrey

23